DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant, Thomas O. Stevers, appeals from a judgment and award of damages issued by the Bowling Green Municipal Court in favor of appellees, Rhue McClure and her husband, Glenn Bellew. For the following reasons, we affirm.
 {¶ 2} The instant lawsuit was commenced on January 26, 2004, when appellant filed a mechanics lien against the appellees' property and initiated a small claims action in the Bowling Green Municipal Court seeking damages in the amount of $1,925, plus interest and costs, for work performed on appellees' home. Appellees filed a pro se counterclaim, wherein they sought damages of their own, on the grounds that appellant's work was improperly performed and would require a substantial amount of money to repair. In addition, appellees challenged the propriety of the mechanic's lien, on the grounds that the last day on which labor, work and materials were performed or delivered was actually October 13, 2003, rather than January 14, 2004, as sworn to by appellant in his affidavit for mechanic's lien.
 {¶ 3} The case proceeded to a bench trial, during which the following evidence was adduced. Appellees, McClure and Bellew, are owners of an old farmhouse in Wood County that had a bowed roof and was in need of new shingles. After speaking to various roofers and researching various roofing materials, appellees contacted appellant about having a new Dura Slate roof installed. Dura Slate is a high-end product that is made of synthetic materials and has the appearance of genuine slate. Appellant told appellees that although he had never installed a Dura Slate roof, he was interested in getting into "high-end roofs" and would be willing to perform the work.
 {¶ 4} On August 20, 2003, appellant prepared a written proposal outlining the agreement for the project. The proposal included the following details: (1) the quote was for labor only; (2) appellees were to pay for all materials; (3) the individual slates were to be hand nailed; (4) copper nails were to be used to ensure 50-year warranty compliance; (5) a structural repair was to be made to address the roof-line bow; and (6) appellees were to pay $3,500 in advance, and the balance upon completion of the job.
 {¶ 5} Appellees gave appellant the required down payment on August 22, 2003, and work on the roof was commenced. Consistent with the terms of their agreement, appellees paid $7,549.51 for roofing materials that were purchased through appellant. And in September and October 2003, they reimbursed appellant a total of $368.95 for other supplies that had been purchased in connection with the project. On September 19, 2003, appellees gave appellant an additional draw of $2,000, when appellant indicated that he needed the money. Finally, on October 11, 2003 — two days before the last of the work was performed on the project — appellees paid appellant $1,977.96, which represented half of the remaining balance that was alleged to have been due at that time. Appellees withheld the remaining balance because they were not in possession of a promised warranty and because they had lingering concerns about the quality of appellant's installation.
 {¶ 6} Appellees proffered evidence at trial — including photographs and testimony by appellee Bellew, and photographs, testimony, and a written inspection report by appellees' expert, licensed general contractor, James S. Johnson — which demonstrated problems with appellant's work: (1) appellant's structural repair to address the exterior roof-line bow exacerbated the slight sagging of the interior ceilings of the home by as much as six inches; (2) continuous ridge ventilation had not been properly installed; (3) step wall flashing to prevent leaks had not been properly installed; (4) an improper setoff on the lower course of tiles left the area vulnerable to leakage and subsequent damage; (5) the failure to use copper nails lowered the warranty period and jeopardized the lifespan of the roof; (6) nails that were improperly driven into tiles, which raised the tiles and caused them not to lay flat; (7) nails that were driven into the wrong location on tiles, rendering tiles more vulnerable to cracking; (8) tiles with only one nail in them, or no nails at all, when they are all supposed to have two; (9) tiles that were cracked due to improper nailing; (10) nails that were left exposed to the weather, causing the potential for leakage and early deterioration of the roof; (11) tiles with chunks missing from them; (12) dents in the siding on the home, caused by appellant's ladders; and (13) mismatched cedar wood installation.
 {¶ 7} According to appellees' expert, all of the above work failed to meet industry standards and failed to meet the requirement that the job be performed in a workmanlike manner. Johnson stated that appellant's structural repair, in particular, put the interior ceilings in serious danger of collapsing, and that proper repair of the ceiling would cost anywhere between $2,200 and $3,000. He further opined that, due to the nature and apparent scope of the problems involving the defectively installed tiles, the roof would have to be completely removed and replaced, and that the cost of that repair could very well exceed $15,000.
 {¶ 8} Appellant Stevers, for his part, offered the following in support of his claim against appellees for the $1,925 balance that was allegedly due on the contract. First, he indicated that he had obtained appellees' consent to use coated steel nails, rather than copper nails to secure the roof tiles — the express terms of his written contract with appellees apparently notwithstanding. According to Stevers, the reasons for his decision not to use copper nails were that they were too expensive and too soft, and they were not required by the manufacturer.
 {¶ 9} Another change in the original plan that was testified to by Stevers — and apparently consented to by the appellee homeowners — was that the nails were not hand nailed, but rather were installed by a pneumatic device. Stevers conceded that appellees were never given any credit for the savings associated with this change.
 {¶ 10} Finally, Stevers testified that after he sent 35-40 photographs of the completed job to the manufacturer, the manufacturer found the installation to have been acceptable and issued a warranty thereon. An e-mail sent by the manufacturer to homeowner-appellee McClure on October 20, 2003, appears to corroborate Stevers testimony and relevantly provides as follows:
 {¶ 11} "After viewing several photos of your roof and after detailed discussions with the installer, we are satisfied your installation of Dura Slate will fully perform and is under full warranty. A copy of the warranty should be obtained by the installer and presented to you. When all the required info [sic] is filled out simply send the appropriate portion to us at the address provided."
 {¶ 12} Also revealed at trial, however, was that the photographs submitted by Stevers were taken from a ladder, which enhanced the appearance of the installation. Absent from this collection of photographs were any shots of slates that were raised or damaged or that had nails sticking up. When the manufacturer subsequently viewed photographs sent in by appellees which contained a more detailed and accurate depiction of the nature of the roof installation, its opinion changed dramatically.[1]
In a subsequent e-mail, dated September 20, 2004, the manufacturer's representative stated:
 {¶ 13} "Ms. McClure . . . After viewing the photographs, it is apparent the installers were sloppy at the very least. I believe the improper nailing, missed nail locations, cracked tiles, etc. is negligent. If the roof were to be taken off, I'm sure there would be other issues as well. If a tile cracks, it cracks at the time of nailing. To leave cracked tiles on a roof is absolutely negligent. I feel you have a very strong case. Missed nails and improper nail location means you have a non conforming installation. Good luck."
 {¶ 14} After hearing all of the evidence, the trial court made the following ruling from the bench:
 {¶ 15} "THE COURT: Very well. Based upon the testimony received, all the exhibits which the Court has reviewed, and the testimony of experts, plaintiff — plaintiff's witness and defendant, Court believes that judgment should be granted in favor of defendants on the counterclaim against plaintiff in the amount of $15,000. It probably would be more if this Court's jurisdiction had — was higher, but it's not. Plus court costs expended herein.
 {¶ 16} "The complaint of plaintiff against defendants would be dismissed. Counsel to prepare the appropriate judgment entry."
 {¶ 17} The trial court issued its judgment entry in this matter on October 22, 2004. Appellant timely appealed the judgment, raising the following as the sole assignment of error:
 {¶ 18} "THE TRIAL COURT ERRED IN GRANTING JUDGMENT TO DEFENDANTS BY FINDING THAT THEY ARE ENTITLED [SIC] DAMAGES UNDER THE HIGHLY DISPUTED FACTS OF THIS CASE FOR THE FULL AMOUNT OF THE DEFENDANTS' PRAYER FOR RELIEF AS THE SAME IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 Standard of review. {¶ 19} Appellant in this case challenges the trial court's award as being both excessive and against the manifest weight of the evidence. In deciding whether a judgment is against the manifest weight of the evidence in a civil action, an appellate court must limit its review to a determination of whether there exists "some competent, credible evidence going to all the essential elements of the case." C.E. Morris v. FoleyConstr. Co. (1978), 54 Ohio St.2d 279, at syllabus.
 {¶ 20} Where the amount of damages is challenged, an appellate court will not disturb the trial court's award absent an abuse of discretion.Valerius v. Houttekier (Mar. 15, 2002), 6th Dist. No. L-01-1283, citingRoberts v. U.S. Fid. Guar. Co. (1996), 75 Ohio St.3d 630, 634.
 Damages. {¶ 21} Where a contractor fails to perform in a workmanlike manner, the proper measure of damages is the cost to repair the damage to the extent that it places the building in the condition contemplated by the parties at the time of the contract. McCray v. Clinton County HomeImprovement (1998), 125 Ohio App. 3d 521, 523-524; Platner v.Herwald (1984), 20 Ohio App.3d 341. "In order to place a building in the condition contemplated by the parties at the time of the contract, `repair of deficient work may involve both additional activities necessitated by the deficient work, and activities previously omitted, but necessary, to proper performance in a workmanlike manner.'" McCray,
supra, quoting Craft Builders v. McCloud (Jan. 14, 1997), 10th Dist. No. 96APE05-716, unreported.
 Analysis. {¶ 22} In the instant case, there was abundant competent, credible evidence demonstrating that appellant failed to perform the contractually agreed-upon repairs to appellees' home in a workmanlike manner. In addition, there was competent, credible evidence demonstrating that the cost of repair to correct appellant's work could very well exceed the $15,000 limit of the trial court's monetary jurisdiction. We therefore find that the trial court did not abuse its discretion in awarding appellees the maximum allowable amount of $15,000.
 {¶ 23} Appellant makes four broad claims in dispute of this conclusion. First, appellant states that appellees' claims for breach of contract for failure to use copper nails "were and are made falsely and maliciously, with knowledge of their falsity, or with such utter disregard and recklessness as to their truth," because appellees were to supply all of the job materials and appellees specifically and intentionally supplied galvanized nails instead of copper. Unfortunately for appellant, such statements are without factual support in the record. Instead, the record unequivocally shows that while appellees were to pay for the materials used in the project, it was appellant who was to, and in fact did, place the order for those materials. Moreover, even if appellees were found to have sanctioned the use of steel nails and the use of steel nails was found to comport with applicable standards of practice, there remains ample other evidence in this case to demonstrate unworkmanlike performance by appellant.
 {¶ 24} Appellant next argues that appellee Bellew inaccurately claimed that the roof-line bow was caused by appellant's work, when the record shows that the roof-line bow existed prior to the work. Contrary to this assertion, Bellew specifically acknowledged that the roof line was bowed and that his ceilings were sagging even before the work began. Bellew's claim with respect to appellant's work was not that it caused the bowing or sagging, but that it had the effect of making already-slightly-sagging ceilings sag much further and crack. Appellees' expert confirmed that appellant's work caused the dangerously sagging and cracking ceilings by putting excessive point load pressure on individual ceiling joists.
 {¶ 25} Appellant also implies in his argument that Bellew directed appellant to perform the work that worsened the roof line bow and caused the ceiling to crack. The record, however, contains no evidence that appellee Bellew directed appellant to perform the repair of the bow in any specific manner. Bellew knew that the work appellant proposed to do would not eliminate the condition entirely. The mere fact that he asked after appellant's initial attempt to fix the bow whether there was anything more appellant could do to fix the problem cannot reasonably be construed as a request for the unworkmanlike performance that he ultimately received.
 {¶ 26} Appellant next claims that appellees' lifting of sample shingles to document the quality of the workmanship was the actual cause of the conditions depicted in the photographs. Nothing in the record supports this assertion. In each case, the lower part of a shingle located above the damaged sample was lifted slightly in order to take the photograph. The lifting could not have caused the damage shown, because the damage appears on the shingle surface below that which is raised. In addition, several of the photographs show unsealed tiles on the upper roof — an area that was untouched by the homeowners.
 {¶ 27} Appellant also challenges appellees' complaints regarding the rake boards, stating that if they did not match, that was the fault of the appellees because they had had the rake boards custom made. A photograph of the mismatched condition shows that the reason the rake boards did not match is that appellant did not use the same outside edge material and, as a result of that error, simply left a top board off. Thereafter, appellant could not make the two sides match.
 {¶ 28} Finally, appellant asserts that the damage award was excessive because (1) there was no evidence that repairs had actually been made; and (2) the amount of the award exceeded both a preliminary estimate obtained May 12, 2004, and the estimate contained in appellees' expert's initial report.
 {¶ 29} We note at the outset that appellant fails to cite, and this court's research has failed to find, any caselaw in support of appellant's assertion that damages cannot be established with estimated costs for repairs and, instead, must be established with amounts actually spent on repairs. To the contrary, our review of the caselaw indicates that estimates for the cost of repairing damage are routinely used to form the basis for the damages awarded. See, e.g., McCray v. ClintonCty. Home Improvement (1998), 125 Ohio App.3d 521, 524 (estimated cost of repair was sufficient to support award of damages by the trial court).
 {¶ 30} In the instant case, appellees' expert's initial report contained an estimate which put the cost of repair between $4,100 and $6,600. At trial, however, the same expert took into consideration other evidence that he acquired after the initial inspection report was released. Specifically, the expert considered the nature and the extent of the damage as it was described at trial, including the existence and number of cracked tiles, missing tile pieces, and improperly nailed tiles. In light of this newly discovered evidence, appellees' expert concluded that in addition to the corrective action that would be required to address the structural damage, the entire roof would have to be removed and replaced.
 {¶ 31} Taking into account all of the expert's testimony, and applying the cost of labor and materials initially incurred by appellees for the original installation, the estimated cost of repairs actually exceeds the trial court's award:

 {¶ 32} Removal/repair of knee walls $1,000.00-$1,500.00
 {¶ 33} Material for knee walls $500.00
 {¶ 34} Repair of ceilings $700.00-$1,000.00
 {¶ 35} New Dura Slate $7,549.51
 {¶ 36} Labor at appellant's rates $6,500.00
 _____________________
 $16,249.51-$17,049.51
 {¶ 37} Appellant relies in error on the May 12, 2004 estimate, which was prepared by Thomas Seiple, president of United Roofing and Sheet Metal, Inc. Although this estimate was secured by appellees, it was never admitted into evidence. In addition to never being admitted, the estimate is itself deficient inasmuch as it makes no mention of the need to remove or replace the knee wall and contains no estimate for the cost of removal and replacement of the roof.
 {¶ 38} For all of the foregoing reasons, appellant's assignment of error is found not well taken. Accordingly, the judgment of the Bowling Green Municipal Court is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Wood County.
Judgment affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Pietrykowski, J., Skow, J., Parish, J., concur.
[1] Bellew indicated that his photographs showing examples of the defective installation were confined to the lower roof because he had no ladder that would reach the upper roof.